## Russell PROCK, Claimant–Appellant,

v.

## HARTVILLE FEED, LLC, Employer–Respondent,

and

## Missouri Division of Employment Security, Respondent.

### No. SD 31310.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 10, 2012.

---

1. All Rule references are to Mo. R. Civ. P.2011 unless otherwise indicated.

Russell Prock, Hartville, MO, pro se.

Ninion S. Riley, Jefferson City, MO, for Respondent, Missouri Division of Employment Security.

DON E. BURRELL, Presiding Judge.

Russell Prock ("Claimant") appeals the decision of the Labor and Industrial Relations Commission ("the Commission") denying him unemployment compensation benefits under section 288.050.1(1)[1] because he voluntarily left his employment as a maintenance worker with Hartville Feed, L.L.C. ("Employer") without good cause.[2] Because the Commission correctly determined that Claimant did not act in good faith in deciding to quit—an essential element of good cause—we affirm.

**Applicable Principles of Review**

■ "This Court may modify, reverse, remand, or set aside the Commission's decision only when: (1) the Commission acted *ultra vires;* (2) the decision was procured fraudulently; (3) the facts found by the Commission do not support the award; [or] (4) there was not sufficient competent evidence to support the award." *Sartori v. Kohner Prop., Inc.,* 277 S.W.3d 879, 882 (Mo.App. E.D.2009). "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton v. Big Boy Steel Erection,* 121

S.W.3d 220, 223 (Mo. banc 2003); *see also* Mo. Const. art. V, sect. 18; section 287.495.1. We defer to the Commission's witness credibility determinations and the weight to be given to the evidence. *Scrivener Oil Co., Inc. v. Crider,* 304 S.W.3d 261, 266 (Mo.App. S.D.2010). Whether the reason for quitting employment constitutes "good cause" is a question of law we review *de novo. Quik 'N Tasty Foods, Inc. v. Division of Emp't Sec.,* 17 S.W.3d 620, 624 (Mo.App. W.D.2000).

**Background**

Employer protested Claimant's request for weekly benefits on the basis that Claimant was considered "a Voluntary Quit[.]" A Division deputy determined that Claimant was conditionally disqualified from receiving benefits because he left work "voluntarily without good cause attributable. to his work or employer on [October 1, 2010]" in that "he walked off the job in the middle of his shift. [C]laimant abandoned the job."[3] Claimant appealed the deputy's determination, and a hearing before the Appeals Tribunal was held in January 2011.

**The Hearing**

*Claimant's Testimony*

Claimant testified that he had worked at his job since August 1990; Employer ac-

---

1. All statutory references are to RSMo Cum. Supp.2010.

2. Claimant is self-represented. Employer did not file a brief. The decision of the Appeals Tribunal ("Appeals Tribunal") of the Missouri Division of Employment Security ("the Division") was adopted by the Commission and will hereafter be referred to as the decision of the Commission. *See Smith v. U.S. Postal Serv.,* 69 S.W.3d 926, 927 n. 1 (Mo.App. S.D. 2002).

3. In a statement supplying additional information to the Division, Claimant stated that while on his lunch hour he returned Employer's keys to the desk of his supervisor, Mark Heppner, and called Heppner to let him know. The statement was admitted as part of the Division's Exhibit 1 during the hearing before the Appeals Tribunal. A statement from Employer admitted as an exhibit at the hearing also reported Heppner's recollection that he went home for lunch and received a call from Claimant stating that he could not do the job.

quired the business in July 2004. Claimant worked "[a]bout 36" hours a week and earned $10 per hour. He quit his job on October 1, 2010. Claimant quit without giving notice to Employer because he "felt like [he had] been pushed and run down in the ground." His problems with Employer started after he suffered a work-related back injury in "February." Thereafter, he could not seem to please his supervisor, Mark Heppner. Claimant described as follows an incident that occurred shortly before he quit.

> That particular day I don't really know what all was actually said, I felt real bad that day. I know [Heppner] was very upset. He hollered at me, had me go over and talk to him. He was very upset and loud talking—he said go home—I went in and clocked out, went and got into my truck and he came out the back door running and says you're not fired, he says come in here and talk to me some more. Then he wants—was talking about the welding on the trucks and this and that and I told him the welding he wanted done I couldn't learn in 24 hours like he wanted, so he just says well that's it. He'd write that down as a not want to.

Claimant testified that Heppner sent him home, then called him back the next day to set up a meeting for the following day. Claimant met at the designated time with Heppner and Jody Flaro, Employer's president and managing member.

> At the meeting they told me they had three jobs lined up for me, they picked the easiest one out for me, gave me a cut in—a dollar cut in pay, had me sign some papers (unintelligible). Anyway, had—had me (unintelligible) papers or else they'd write me down as a voluntary quit, so those were filled out and they went through the records and whatnot, what they wanted me to do, made sure I

understood that and then sent me to work.

Claimant understood from the meeting that he was demoted "from being maintenance guy to cleaning guy" because he "didn't check the oil in the Jeep," a task included in his checklist of duties. He had previously discussed with Heppner the fact that it was impossible for him to complete all of his listed duties, but no changes were made.

Claimant left work and quit his job after his meeting with Heppner and Flaro because he was depressed and did not feel well. He had actually been prescribed medication for depression the day before he quit work. He did not tell Employer that he had been diagnosed as suffering from depression.

### Flaro's Testimony

Flaro testified that he did not have with him the information about Claimant's injury but that Claimant's "assessment of around February, 2010 seem[ed] right." After that injury, Claimant was released back to full duty "around July." Flaro said,

> Despite being released for full work duty there were still a number of items on [Claimant]'s daily checklist which he didn't feel comfortable doing so consequently the job checklist wasn't getting done and the items that weren't getting done, some of them had to do with climbing which is what he said he didn't feel comfortable with. Having said that there were a number of items that weren't getting performed, checking the oil in the Jeep was one of them that he was physically capable of doing, he was trained on how to perform[;] he just chose not to get it done at the end of the day.

Although some items might not get done every day, they "should get done at some point over the course of the next week."

Flaro cited checking the Jeep's oil as an item that had not been completed "for months."

At their October 1st meeting with Claimant, he and Heppner discussed "a new job checklist" with Claimant.

[T]he whole purpose of going through that was to set [Claimant] up for success so that he could actually get the job checklist done. [Claimant] states that it was a demotion, it was more of an accommodation if anything which we didn't have any—any requirement to do given that he was released for full duty that we were accommodating him because he didn't feel comfortable and we respected that. So we changed the job checklist which ended up having a lot of cleaning duties assigned to it. What we did was we simplified it as much as we could to allow him to complete the job checklist.

Claimant's pay would be changed from $10 to $9 per hour, but Claimant had "the opportunity to earn $40 per week of performance pay and all he had to do to do that was to complete the [simplified] items on the job checklist." Flaro said, "Eighty percent of our employees receive performance pay every week for completing their job checklist." Claimant had not been receiving performance pay because he had not been completing his checklist. Claimant had generally worked 36–40 hours per week and would be permitted to work up to 40 hours per week to complete his new checklist. Flaro reasoned that if Claimant worked 40 hours a week and earned his performance pay, he would actually make more money than he had previously been making.

He and Heppner asked Claimant if he was trained, able, and willing to do the items on the revised checklist. Claimant indicated that he was trained, able, and willing to do the work, with the exception of cleaning the production area because

that would require him to work past 5:00. It was then agreed that this particular item would be removed from Claimant's duties and a new checklist omitting that task would be prepared. Flaro agreed that Claimant seemed to be depressed, and Flaro stated, "It was clear to me that [Claimant] hasn't had his heart in the job for a long time." By the end of their meeting, Flaro understood that Claimant "would do the new job as outlined." Flaro later learned that Claimant was observed turning in his keys after lunch.

### Heppner's Testimony

Heppner initially testified that he thought Claimant's back injury had occurred sometime before late 2006 and before Heppner started working as Claimant's supervisor. As far as he could recall, Claimant had already been "released to full duty" by the time Heppner started supervising Claimant. Upon cross-examination by Claimant, Heppner said he then realized that Claimant was talking about an injury in February 2010, but Heppner was not specifically questioned about Claimant's release to work after that later injury. Claimant had job performance problems from the time Heppner started working with him, which Heppner described as "a lack of performance." It "was an on-going struggle for [Claimant] to complete" his checklist. Heppner described as follows the incident where he sent Claimant home shortly before their meeting with Flaro:

It was in regards to his job performance. Again I was—I was at my limit. I'd been through many different verbal warnings, written warnings, I talked to him about his job performance on several occasions and nothing was ever changed. He never changed anything. He never improved any—and so I—I

told him I'm done with you today you need to just go home.

Heppner recalled that Claimant's checklist was changed "to include just very rudimentary every day items. A lot of them had to do with housecleaning." Claimant agreed that he could and would do the duties on the new checklist. Claimant's pay was reduced to $9 per hour, but "the opportunity to mak[e] 40 [dollars] a week for performance" remained and it "was very realistic" that Claimant could have obtained performance pay under his new checklist.

Claimant then failed to return to work and called Heppner at home. Claimant told Heppner, "I can't do it any more. I don't want to work here any longer. I'm resigning. I'll leave my keys on your desk."

### The Commission's Findings

[C]laimant worked for [E]mployer in maintenance from July of 2004 until he quit work on October 1, 2010. His final rate of pay was $10.00 per hour, and he worked about 36 hours a week.

[C]laimant repeatedly informed [E]mployer that he could not complete all of the requested maintenance and cleaning work duties. On October 1, 2010, [E]mployer's president reduced [C]laimant's work duties to primarily cleaning duties and reduced his hourly pay from $10.00 per hour to $9.00 per hour with an addi-

tional $40.00 per week of performance pay if [C]laimant completed all of the work duties. [C]laimant quit work because of the reduction in his hourly pay. He made no attempt to earn the performance pay before he quit work.

The Commission found that "[a]ll of the evidence shows that [C]laimant left work voluntarily on October 1, 2010. The issue is whether [C]laimant left work voluntarily with good cause attributable to the work or to [E]mployer in order to be entitled to receive unemployment benefits." In addressing that question, the Commission stated,

Good faith is an essential element of the standard of good cause, and good faith does require an effort to resolve the problem with the employer to the extent possible before quitting. [C]laimant did not attempt to resolve the problem with [E]mployer to the extent possible before he quit work because he did not attempt to perform the reduced workload and did not attempt to earn the performance pay. If [C]laimant would have received the performance pay, then he would have increased his total weekly pay.

As a result, the Commission found Claimant ineligible for benefits because "[C]laimant left work voluntarily without good cause attributable to the work or to [E]mployer on October 1, 2010." [4]

4. The Commission's decision was not unanimous. The dissenting commissioner would have decided the claim as follows:

Here, [C]laimant quit because [E]mployer asked [C]laimant to work more hours for less pay and to agree to have a portion of his compensation tied to whether he could complete a rotating checklist of 53 different tasks, some of which appear to be extensive enough to require part of an entire day to complete. All of these changes were imposed on [C]laimant because his work performance deteriorated in connection with

an injury he sustained while working for [E]mployer.

The dissent concluded that "[C]laimant acted reasonably in deciding to quit" and "[C]laimant fulfilled his burden of acting in good faith before terminating his employment." The dissent notes that good faith does not always require an employee to attempt to work through the changes in his duties especially "where an employer effects a unilateral and drastic change in a claimant's working conditions and demands that the claimant either accept the new conditions or lose the job."

## Analysis

Our review of Claimant's appeal is significantly hindered by the deficiencies of his brief. "[P]ro se litigants are held to the same standards as attorneys." *DiRusso v. DiRusso*, 350 S.W.3d 464, 466 n. 3 (Mo.App. S.D.2011). "While this court recognizes the problems faced by pro se litigants, we cannot relax our standards for non lawyers. It is not for lack of sympathy but rather it is necessitated by the requirement of judicial impartiality, judicial economy and fairness to all parties." *Sutton v. Goldenberg*, 862 S.W.2d 515, 517 (Mo.App. E.D.1993) (internal citation omitted.) Here, Claimant's brief contains no point(s) relied on—a violation of Rule 84.04(a)(4) and (d).[5] Generally, an issue not presented in a point relied on is not preserved for review. *Lusher v. Gerald Harris Constr., Inc.*, 993 S.W.2d 537, 544 (Mo.App. W.D.1999).

In a section entitled "STATEMENT OF APPEALABILITY[,]" Claimant summarizes the procedural history of his case and states, "I feel I quit with good cause[ ] (Section 288.050)." It is difficult to discern whether this is Claimant's assertion of the legal reason why the Commission's decision must be reversed. Claimant also freely mixes in argument with his statement of facts, a violation of Rule 84.04(c), while the actual argument section of his brief consists of only three sentences.

Other significant defects include Claimant's failure to: 1) state a standard of review, *see* Rule 84.04(e); 2) explain the legal reason(s) for the alleged error(s) based on the context of the case, *see* Rule 84.04(d)(2)(B) and (C); and 3) provide citations to the record as required by Rule 84.04(i).

The Division, however, has not asked us to dismiss Claimant's appeal on the ground that the rule violations hinder its ability to respond to Claimant's appeal. According to the Division, one of "[t]he issue[s] before this Court is whether a reasonable person would have quit this job without taking any further steps to resolve the matter." More specifically, the Division alleges Claimant "did not demonstrate 'good faith' in that he did not take reasonable steps to resolve the matter with [Employer] prior to quitting." Claimant's reply brief appears to accept this particular ground as a means of resolving the appeal, countering that Claimant demonstrated his good faith in "tak[ing] reasonable steps to resolve the matter with [E]mployer prior to [Claimant]'s quitting."

"[W]hen possible appellate courts prefer to address the merits of an appeal."

---

The difference in the dissenting commissioner's conclusion may result from differing credibility determinations. Our job is not to re-weigh the testimony; it "is to determine whether the Commission, based upon the whole record, could have reasonably made its findings and reached its result." *Partee v. Winco Mfg., Inc.*, 141 S.W.3d 34, 37 (Mo.App. E.D.2004).

5. All rule references are to Missouri Court Rules (2011). Rule 84.04(d)(2) provides:
Where the appellate court reviews the decision of an administrative agency, rather than a trial court, each point shall:
(A) identify the administrative ruling or action the appellant challenges;
(B) state concisely the legal reasons for the appellant's claim of reversible error; and
(C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.
The point shall be in substantially the following form: "The [*name of agency*] erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error, including the reference to the applicable statute authorizing review*], in that [*explain why, in the context of the case, the legal reasons support the claim of reversible error*]."

*Bressler v. The Wooten Co., L.L.C.*, 213 S.W.3d 240, 242 (Mo.App. S.D.2007). As a result, we will consider the dispositive issue of whether the Commission erred in finding that Claimant failed to demonstrate good faith by failing to take reasonable steps to attempt to resolve the situation that troubled him before quitting.

"An employee who quits a job is qualified for unemployment benefits only if he does so for good cause, a matter which he has the burden to establish." *Mitchell v. Division of Emp't Sec.*, 922 S.W.2d 425, 427 (Mo.App. S.D.1996). "Good faith is an essential element of good cause, and to establish it the employee must prove that he made an effort to resolve the troublesome situation before terminating his job." *Department of Nat. Res. Parks & Recreation v. Lossos*, 960 S.W.2d 537, 540 (Mo. App. S.D.1998).[6] Unless it is clear that it would be futile to attempt to work through conditions otherwise justifying resignation, a claimant must demonstrate his own good faith in trying to resolve the situation before resorting to the extreme measure of quitting his job. *Cf. Cooper*, 31 S.W.3d at 505 (a prior complaint by the employee to management is not necessary for good faith when evidence suggested that employee's change in duties was substantial and that employer's motives were not sincere); *Partee*, 141 S.W.3d at 38–39 ("distasteful, abhorrent comments and conduct" by a supervisor did not remove employee's duty to provide to human resources the details necessary to investigate the matter before quitting); and *Streitz v. Juneau*, 940 S.W.2d 548, 551 (Mo.App. S.D.1997) (employee had good cause to quit after employee asked employer to stop calling him profane and offensive names and employer did not).

Here, Claimant testified that he learned the day before he quit that he was depressed and he was not feeling well the day he quit his job. Flaro agreed that Claimant seemed depressed. Depression is a serious condition, but Claimant did not disclose it to Employer and made no request for medical leave. And the Commission was entitled to believe the testimony that Employer was attempting to assist Claimant with handling the difficulties he was experiencing in completing his assigned work. Flaro testified that Employer "changed the job description to accommodate him rather than to punish him or demote him."

The Commission was not required to believe Claimant's testimony that he felt he would be unable to please his supervisor no matter what he did. Claimant did not attempt to perform his new duties, which would have potentially allowed Claimant to earn at least as much as he had previously earned and perhaps more. The Commission was entitled to believe that Employer was sincere about working to accommodate Claimant's needs, especially in light of the fact that it responded to Claimant's concern about working past 5:00 by removing from his duties the task that Claimant believed would cause that to occur.

We cannot say the Commission erred in finding that "[C]laimant did not attempt to resolve the problem with [E]mployer to the extent possible before he quit work because he did not attempt to ... earn

---

**6.** Good cause also includes the element of reasonableness. *Cooper v. Hy–Vee, Inc.*, 31 S.W.3d 497, 503 (Mo.App. W.D.2000). It was not reasonable for Claimant to quit his job based upon the 10 percent reduction in his hourly wage paid upon reduced duties with-

out attempting to earn the extra performance pay. As the Division argued, "[a] reasonable person would try to perform the assigned tasks and see if the $40.00 weekly bonus was attainable."

[his] performance pay." This finding that Claimant did not act in good faith was supported by substantial, competent evidence. Claimant's failure to show good faith negated his claim that he had good cause to quit his employment—an essential part of establishing his qualification for weekly benefits. The decision of the Commission is affirmed.

RAHMEYER and LYNCH, JJ., Concur.