

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FIVE

| | | |
|---|---|---|
| DAVID DARR, | ) | ED100197 |
| | ) | |
| Appellant, | ) | |
| | ) | Appeal from the Labor and |
| vs. | ) | Industrial Relations Commission |
| | ) | |
| ROBERTS MARKETING GROUP, LLC | ) | 13-07274R-A |
| AND DIVISION OF EMPLOYMENT | ) | |
| SECURITY, | ) | |
| | ) | |
| Respondents. | ) | Filed: April 22, 2014 |

David L. Darr appeals the decision of the Labor and Industrial Relations Commission ("the Commission") denying him unemployment benefits. The question presented is whether, in refusing to sign a proffered non-compete agreement which was required as a condition of continued employment, Mr. Darr left work voluntarily, but with good cause attributable to his employer, Roberts Marketing Group, LLC ("Employer"). We reverse and remand.

## STANDARD OF REVIEW

The scope of our review of the Commission's decision is delineated both by our state constitution and by statute. We are required by Mo. Const. art. V, § 18 to determine whether the Commission's decision is "authorized by law" and "whether it is supported by competent and substantial evidence upon the whole record." *Pulitzer Publishing Co.*

*v. Labor & Indus. Relations Comm'n*, 596 S.W.2d 413, 417 (Mo. banc 1980); *Hubbell Mechanical Supply Co. v. Lindley*, 351 S.W.3d 799, 807 (Mo. App. S.D. 2011).

Our review is also conducted pursuant to the narrow standard set forth in section 288.210.[1] Under this standard, we do not hear any new evidence but rather determine whether the Commission's findings of fact upon the record before us are supported by competent and substantial evidence. If so, the findings are deemed conclusive in the absence of fraud. *Osman v. Div. of Empl. Sec.*, 332 S.W.3d 890, 892 (Mo. App. E.D. 2011). We may modify, reverse, remand for rehearing, or set aside the award upon finding: (1) that the Commission acted without or in excess of its powers; (2) that the award was procured by fraud; (3) that the facts found by the Commission do not support the award; or (4) that there was not sufficient competent evidence in the record to warrant the making of the award. Section 288.210.

"Decisions of the Commission which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding upon us and fall within our province of review and correction. When it is clear that the Commission's decision resulted from its application of the law, instead of its application of reason to the facts, we give no deference to the Commission's conclusions and use our own independent judgment." *Osman*, 332 S.W.3d at 892-93 (internal citations and quotation marks omitted).

"In examining the record, we must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence. We defer to the Commission's determinations on issues resolving matters of witness credibility and

---

[1] All further statutory references are to RSMo 2000 and Cum. Supp. 2012.

2

conflicting evidence. The Commission's decision should not be overturned unless it is contrary to the overwhelming weight of the evidence. The reviewing court is *not* to view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award. Instead, we must objectively review the entire record, including evidence and inferences drawn therefrom that are contrary to, or inconsistent with, the Commission's award." *Hubbell Mechanical Supply*, 351 S.W.3d at 807 (internal citations and quotation marks omitted); *see also Timberson v. Div. of Empl. Sec.*, 333 S.W.3d 30, 32 (Mo. App. W.D. 2010).

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Darr began working for Employer selling final expense life insurance in October 2012.

Ms. Dina Hakim, Employer's director of human resources, testified that Employer announced on January 24, 2013, that it would be implementing a new non-compete agreement for its employees. As the terms of this agreement are relevant to our analysis of the issues presented, we set forth some of its contents in detail.

In its preamble, this proposed "Confidentiality and Non-Competition Agreement" recited, "WHEREAS, Company desires to continue the employment of Employee, but contingent upon signing this Agreement" (emphasis added). In some of it provisions, the Agreement provided:

> 3. Covenant not to compete.
>
> (a) Employee expressly covenants and agrees that during the term of employment with Company and for a period of thirty-six (36) months immediately following the expiration or cessation of employment with Company for any reason, EMPLOYEE SHALL NOT in any way, directly or indirectly, individually or on behalf of or in cooperation with any other person, group of persons, partnership, company, corporation, association or any other entity;

3

Engage in any business competing directly or indirectly with any product, service or business venture related in any manner to or concerning the Company's Business in any Region in which the Company conducts same.

(b) Definitions.

i. For these purposes, the "Company's Business" is defined as the lead generation of and/or sale of any and all type life insurance policies through telesales.

ii. For these purposes, "Region" is defined as the continental United States, including Alaska and Hawaii, and all U.S. territories.

. . .

6. Damages. With respect to each and every breach or violation or threat of same by Employee of any of the covenants, terms and provisions of Paragraphs 1, 2, 3 or 4 and throughout this Agreement, Company, in addition to all other remedies, shall be entitled to enjoin the continuance thereof and may apply to any Court of competent jurisdiction for entry of an immediate restraining order or injunction.

In addition, Employee agrees to immediately, upon demand, account for and pay over to Company an amount equal to all compensation, commission, bonus, salary, gratuity or other remuneration or emolument of any kind directly or indirectly received by or for the use or benefit of Employee resulting from any activity, transaction or employment in breach or violation of Paragraph 3 of this Agreement, such amount being agreed to constitute liquidated damages, and not a penalty.

. . .

9. Waiver of Defenses. Employee waives any objection to any and all terms and conditions of this Agreement, including but limited to Paragraphs 1, 2, 3 and 4 hereof, and covenants to institute no suit or proceeding or otherwise to advance any position, defense or contention to the contrary.

10. Employee's Representations on Ability to Earn a Living. Employee acknowledges that the covenants, terms and provisions of this Agreement are reasonable and do not impose a financial hardship on Employee. Employee acknowledges the ability to engage in gainful activities for the purpose of earning a living other than those violative of this Agreement. The Employee represents and warrants to Company that Employee's expertise and capabilities are such that Employee can pursue a livelihood without breaching the terms and conditions of this Agreement and that the obligations under this Agreement (and the enforcement thereof by injunction or otherwise) will not prevent Employee from earning a livelihood.

. . .

12. Tolling Provision. In the event that the Employee is in breach of any of the provisions of Paragraph 3, the period of proscription from the act or acts that

4

constitute a breach of Paragraph 3 shall be extended for a period of thirty-six (36) months from the date that the Employee ceased, whether voluntarily or by Court order, to engage in said actions.

Among the remaining sections of the non-compete agreement were provisions requiring the employee to pay all of Employer's costs, expenses, and reasonable attorney's fees incurred in enforcing the agreement in the event of a violation by the employee; a waiver of any right to jury trial; a severability clause; and a waiver of the application of the rule of strict construction against the drafter.

In Ms. Hakim's written statement filed with the Commission, she stated that all employees would be required to sign the non-compete agreement by February 1, 2013. A company-wide meeting was held on January 29, 2013, at which employees were allowed to ask questions regarding the agreement, and were provided a notary public on site to facilitate execution of the documents. There was no evidence to suggest that Employer permitted any actual negotiation of the agreement's terms by Mr. Darr or any other employee.

On January 30, 2013, Mr. Darr met with his direct manager and with the vice president of sales and marketing, Mr. Ramiz Hakim. Mr. Darr expressed that he was not inclined to sign the agreement and that he needed to speak to an attorney. Mr. Hakim acknowledged that Mr. Darr asked "some very good questions" about the agreement during their meeting. Mr. Darr was informed that signing the non-compete agreement was a condition of his employment and that the agreement needed to be signed and notarized by February 1. The following day, January 31, Mr. Darr met with Ms. Hakim and with Mr. Aaron Eidson, Employer's vice president of operations. Mr. Darr again stated that he was not willing to sign the agreement and needed to speak to an attorney.

However, Ms. Hakim reports that at the conclusion of this 30-minute meeting, Mr. Darr stated that he would sign and notarize the agreement by February 1.

Mr. Hakim indicated that during these meetings he discussed certain alternatives with Mr. Darr, including transfer to another department. The transfer would have been to a position in the marketing department. Mr. Darr believed, based upon his previous experience in the company, that this position would involve a less lucrative compensation structure. Mr. Darr also believed, based on information shared with him by persons in the company, that employees in the marketing department eventually would also be required to sign the non-compete agreement.[2] Mr. Darr declined these alternatives.

Although the record shows that Employer was willing to give Mr. Darr a little more time after the January 31 meeting with management to execute the non-compete agreement, there is nothing in the record to support the conclusion that Employer actually offered him any extension beyond February 1 for this purpose. Mr. Eidson testified that extensions of up to 30 days were granted to other unidentified employees, but he did not testify that such an offer had ever been given to Mr. Darr on or before the morning of February 4. Rather, Ms. Hakim's written statement confirms that on the morning of February 1, Mr. Darr "was informed that he would be required to turn in the agreement by the end of the work day."

On February 1, 2013, Mr. Darr reported to work without the signed agreement. He again met with Employer's human resources personnel, and stated that he would not sign the agreement before obtaining legal advice. Mr. Darr was granted permission to

---

[2] During the hearing, Mr. Hakim failed to answer a direct question as to whether employees in the marketing department had subsequently been required to execute the non-compete agreement.

6

leave work for a few hours to consult with counsel.[3] At approximately 12:30 p.m. that day, Mr. Darr called in, indicating that he was unsuccessful in meeting with his attorney and that he was requesting a "sick day," as he would not be returning for the remainder of his shift.

At some point during this timeframe, Mr. Darr was able to consult with an attorney, who advised him that the non-compete agreement was unconscionable and that he should not sign it.

On Monday morning, February 4, Mr. Darr returned to work and was escorted into the premises by Mr. Hakim and Mr. Eidson. What then occurred is disputed by the parties. Employer contends that Mr. Darr was instructed to wait outside the human resources office until staff could meet with him to discuss his concerns; however, Mr. Darr left a few minutes later without communicating his reasons to anyone. Mr. Darr contends that he overheard management personnel talking about calling the police, and he left as a result of his fear of being arrested for trespass. The Commission did not render a specific finding of fact as to what occurred that morning. We assume for purposes of this opinion that Mr. Darr left Employer's premises voluntarily on the morning of February 4, 2013.

Employer's human resources office left a telephone message for Mr. Darr later that morning, advising that they would consider his departure from the premises as job abandonment if they did not hear from him in a timely manner. Mr. Darr did not

[3] At this time, Mr. Darr ceased being in possession of his employee security badge, which was his identification and his means of access to Employer's premises. Mr. Darr contends that one of Employer's agents had removed it from his desk while he was meeting with the managers about the non-compete agreement, and that he was escorted out of the building when he left on February 1. Employer contends that Mr. Darr left the badge on his desk when he left, and that Employer took possession of the badge as a security measure. The parties agree that Mr. Darr was no longer in possession of his employee badge when he returned to Employer's premises on the morning of February 4. We accept Employer's version of the facts as to this issue.

thereafter contact Employer or return to work. Employer's handbook, which Mr. Darr had signed, provided that if an employee is absent for three days without notifying the employer, it is assumed that the employee has voluntarily abandoned his position with Employer.

Mr. Darr filed a claim for unemployment benefits. A deputy determined that Mr. Darr was not disqualified from receiving benefits because he was discharged on January 31, 2013, but not for misconduct connected with his work. The deputy specifically found that Mr. Darr had been discharged because he declined to sign the non-compete agreement within one week, and that Employer had changed his conditions of work.

The appeals tribunal reversed the deputy's determination, the finding that Mr. Darr voluntarily left his employment without good cause attributable to Employer. The appeals tribunal found that Mr. Darr was unsure about whether to execute the non-compete agreement and wanted to talk with an attorney, but failed to arrange time with Employer to do so; therefore, his voluntary departure from work was without good cause. The Commission affirmed the appeals tribunal's decision and adopted the decision as its own. Mr. Darr now appeals.

## DISCUSSION

Mr. Darr presents three points on appeal. In his first point, he claims the Commission erred in finding he left his employment voluntarily on January 31, 2013.[4] In

---

[4] We note that in his first point on appeal, Mr. Darr contends that the Commission's findings regarding the date he left employment are not supported by competent and substantial evidence. Mr. Darr correctly points out an inconsistency in the decision of the appeals tribunal, which was adopted by the Commission. In its findings of fact, the appeals tribunal found that January 31, 2013 was Mr. Darr's last day of work for Employer, "because he quit work for employer on that day." However, in the same decision, in its conclusions of law, the appeals tribunal concluded that Mr. Darr voluntarily left work for Employer on February 4, 2013. Due to our resolution of Mr. Darr's third point on appeal, we need not specifically decide this question. We assume for purposes of this opinion that Mr. Darr's last day of employment was February 4, and that he voluntarily left work on that date.

8

point two, Mr. Darr contends the Commission erred in finding he was disqualified from receiving benefits because the evidence showed he was discharged on February 1, 2013, for refusing to sign the non-compete agreement, and that said refusal to sign the agreement did not constitute misconduct connected with his work. Because our analysis of his third point is dispositive, we need not consider Mr. Darr's first two points on appeal.

In his third and final point, set forth in the alternative to the second point, Mr. Darr claims there was not sufficient competent evidence to support the Commission's conclusion that he voluntarily left his job on February 4, 2013 without good cause attributable to his work or his employer. Rather, he contends that the competent and substantial evidence in the record requires the conclusion that he left work to avoid having to sign Employer's non-compete agreement, which, under the facts of this case, constituted good cause attributable to his employer. We agree.

Pursuant to Section 288.050.1(1) RSMo, a claimant shall be disqualified from receiving unemployment benefits upon a finding that the claimant left work voluntarily without good cause attributable to the work or to claimant's employer. Section 288.050.1(1) must be strictly and narrowly construed in favor of finding that an employee is entitled to compensation. *Renda v. Eastern Metal Supply of Mo., Inc.*, 414 S.W.3d 556, 559 (Mo. App. E.D. 2013). A claimant leaves work voluntarily if he leaves of his own accord rather than being discharged, dismissed, or subjected to layoff. *Id.* Whether an employee was fired or voluntarily quit is a question of fact, and we review the determination with deference to the Commission. *Mauller v. Div. of Empl. Sec.*, 331

9

S.W.3d 714, 718 (Mo. App. W.D. 2011). The determinative question is whether the employer or employee committed the final act which severed the relationship. *Id.*

The evidence in this case as to whether Mr. Darr was discharged or voluntarily left employment was very much in conflict. As reflected by the differing results in the proceedings below, competent and substantial evidence could be found to support either conclusion. *See, e.g., Sokol v. Labor & Indus. Relations Comm'n*, 946 S.W.2d 20, 24-26 (Mo. App. W.D. 1997).[5] We find that Mr. Darr voluntarily left employment. We assume for purposes of this opinion that this occurred on February 4, 2013, when Mr. Darr left Employer's premises for the final time.

If a claimant is determined to have voluntarily left work, the question becomes whether the claimant had good cause, attributable to the work or to the employer, to leave employment. Sec. 288.050.1(1); *Cooper v. Hy-Vee, Inc.*, 31 S.W.3d 497, 502 (Mo. App. W.D. 2000). The determination of whether an employee had "good cause" to leave his employment voluntarily is determined on a case-by-case basis. Whether good cause is established upon the particular facts of each case is a question of law, which we review independently without any deference to the Commission's determination. *Shelby v. Hayward Baker, Inc.*, 128 S.W.3d 164, 170 (Mo. App. S.D. 2004). The burden of proving the existence of good cause for leaving work attributable to work or to the employer is upon the claimant. *Cooper*, 31 S.W.3d at 502. Good cause has been interpreted to mean those circumstances that would cause a reasonable person in a similar

---

[5] Although it does not specifically so state, the original determination by the deputy who first heard and ruled upon this case would appear to be consistent with the legal principles set forth in *Sokol*, 946 S.W.2d at 24-25 (discharge for failure to agree to new terms of employment under non-compete agreement not considered to have been a voluntarily quit). The *Sokol* court, in an opinion authored by Judge Stith, chose to analyze the facts before it under both theories – involuntary discharge and voluntary quit – and reached the same conclusion under both analyses: that the claimant was entitled to unemployment benefits.

10

situation to leave the employment rather than continue working. *Shelby*, 128 S.W.3d at 170. "Conditions that motivate the employee to voluntarily leave must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical, and good faith is an essential element." *Cooper*, 31 S.W.3d at 503 (internal citations and quotation marks omitted). To establish the element of good faith, "the employee must prove that he made an effort to resolve the troublesome situation before terminating his job." *Shelby*, 128 S.W.3d at 170.

Mere dissatisfaction of an employee with his working conditions does not constitute good cause. *Cooper*, 31 S.W.3d at 504. The dissatisfaction must be based on a substantial change in the wages or working conditions from those in force at the time employment began. *Id.* Absent discriminatory or unfair or arbitrary treatment, mere dissatisfaction with working conditions does not constitute good cause for quitting employment unless the dissatisfaction is based upon a substantial change in wages or working conditions from those in force at the time the claimant's employment commenced. *Sokol*, 946 S.W.2d at 26-27. "The circumstances motivating an employee to quit must be caused by external pressures so compelling that a reasonably prudent person would be justified in terminating his employment." *Shelby*, 128 S.W.3d at 170; *Sokol*, 946 S.W.2d at 26. *See also Osman*, 332 S.W.3d at 893-94.

Having carefully reviewed the entire record, we conclude that two of the Commission's specific findings, relevant to the determination of whether Mr. Darr had good cause for leaving his employment attributable to the employer, were not supported by competent and substantial evidence.

11

First, the Commission found that extensions of time could be obtained for review and execution of Employer's non-compete agreement. While there is evidence in the record from which the Commission could have found that other employees may have been offered such extensions of time, there is no competent and substantial evidence to support the finding that such an extension was actually offered to Mr. Darr. Rather, Ms. Hakim's testimony makes clear that the message communicated to Mr. Darr was that February 1, 2013, was his last day to execute the non-compete agreement, if he wished to keep his job. We do not require a clairvoyant ability on the part of the claimant to predict an action or attitude that the employer may have chosen to undertake at some future time. Rather, the objective reasonableness of Mr. Darr's decision to leave employment must be evaluated in terms of what he knew and what he reasonably believed on the morning of February 4, 2013.

Second, the Commission found as a fact that Employer's non-compete agreement "prohibited agents from selling the life insurance over the phone under the employer's package for three years after leaving work for the employer." While not inaccurate as far as it goes, the Commission's finding dramatically understates the scope and coverage of the non-compete agreement. Even a cursory review of the relevant provisions of the agreement, set forth above, discloses that the scope of the non-compete clause, the obligations and liabilities of the employee, and the waivers of rights comprehended in the agreement extend far beyond what the Commission has described in its findings.

Our Supreme Court recently summarized the guiding legal principles regarding non-compete agreements:

> The law of non-compete agreements in Missouri seeks to balance the competing concerns between an employer and employee in the workforce. On

12

one hand, employers have a legitimate interest in engaging a highly trained workforce without the risk of losing customers and business secrets after an employee leaves his or her employment. On the other hand, employees have a legitimate interest in having mobility between employers to provide for their families and advance their careers. Furthermore, although the law favors the ability of parties to contract freely, contracts in restraint of trade are unlawful.

In balancing these competing interests, Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer. A non-compete agreement must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Accordingly, a non-compete agreement is enforceable only to the extent that the restrictions protect the employer's trade secrets or customer contacts. The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space.

*Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841-42 (Mo. banc 2012). *See*

*generally*, William M. Corrigan and Michael B. Bass, "Non-Compete Agreements and

Unfair Competition – An Updated Overview," 61 J. MO. BAR 81 (2006).[6]

---

[6] Mr. Darr suggests that we should find good cause for his departure from employment on the grounds that several of the provisions of the non-compete agreement would likely be held to be unreasonable, and hence invalid, under Missouri law, leading a court to declare all or part of the agreement unenforceable or to substantially alter its terms. He cites us to numerous cases for these propositions, including *Whelan*, 379 S.W.3d at 842-45, 844 n.6 (customer non-solicitation clause in non-compete agreement held overbroad and modified; in footnote 6, citing additional cases in which courts declined to enforce non-compete agreements found "wholly unreasonable"); *Brown v. Rollet Bros. Trucking Co., Inc.*, 291 S.W.3d 766, 773-79 (Mo. App. E.D. 2009) (non-compete agreement unenforceable where unreasonably broad as to customer contacts and business information covered); *Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 432-36 (Mo. App. S.D. 2008) (invalidating non-compete agreement prohibiting employee from working "in any business that is in competition with" former employer within a 50-mile geographic radius, where no protectable customer contacts or trade secrets affected); *Systematic Business Svcs., Inc. v. Bratten*, 162 S.W.3d 41, 49-52 (Mo. App. W.D. 2005) (non-compete agreement restricting employee from working in certain line of business for two years, without geographic restriction, held unenforceable); *West Broadcasting Group v. Bell*, 942 S.W.2d 934, 936-39 (Mo. App. S.D. 1997) (non-compete agreement unenforceable to prevent former employee from working for competitor where no protectable customer contacts or trade secrets affected); *Mid-States Paint & Chemical Co. v. Herr*, 746 S.W.2d 613, 616-17 (Mo. App. E.D. 1988) (modifying time and geographic coverage of non-compete agreement affecting sales representative); *Continental Research Corp. v. Scholz*, 595 S.W.2d 396, 399-403 (Mo. App. E.D. 1980) (refusing to enforce non-compete agreement beyond former employee's previously assigned territory, where no protectable customer contacts or trade secrets affected).

The Commission responds, correctly, that the ultimate issues of the reasonableness and enforceability of Employer's non-compete agreement are not properly before this Court in this litigation. This conclusion, however, does not resolve the matter in favor of the Commission, as it remains for us to apply the correct legal standard by considering whether the proposed non-compete agreement would have

The court in *Sokol v. Labor & Indus. Relations Comm'n*, 946 S.W.2d 20 (Mo. App. W.D. 1997), considered the question of whether the imposition of a revised non-compete clause in an employment contract constituted good cause to voluntarily leave employment.[7] In *Sokol*, the court held that the employer's insistence that the employee immediately sign a new contract containing a new non-compete provision, without any opportunity to consult with an attorney, represented "just the type of arbitrary behavior which we believe justifies a voluntary quit." *Id.* at 27. The *Sokol* court further held that where the terms of the revised non-compete agreement were significant, resulting in a much broader scope as to both geographic coverage and the range of prohibited economic activity, this was a "matter of such gravity that Mr. Sokol could have determined in good faith that he had no reasonable alternative but to leave work." *Id.* at 28. Using forceful language, the court wrote that "[t]he new non-competition clause barred Mr. Sokol from engaging in the business for which he was trained. It is hard to conceive of a more critical or substantial change in the terms of employment to which Mr. Sokol was subject." *Id.* (internal citations and quotation marks omitted).

Here, as in *Sokol*, the proposed new non-compete agreement was presented to Mr. Darr with an ultimatum that it be signed within a very short period of time, affording Mr. Darr only a limited opportunity to review the draft agreement and to seek legal advice. Here also, as in *Sokol*, the proposed non-compete agreement would have placed numerous additional restrictions and burdens upon Mr. Darr's ability to find and maintain

---

constituted a substantial change in Mr. Darr's working conditions from those in effect at the time his employment commenced.

[7] In *Sokol*, the employee was presented with a modification to an existing contract of employment containing a substantially different non-compete clause. In the case now before us, Mr. Darr was an at-will employee, and there was no previous contract of employment. This factual distinction does not change the applicable analysis – that of whether a substantial change in working conditions would have been brought about by the employee's enforced acceptance of the new non-compete agreement.

14

new employment after leaving Employer, none of which were in force at the time his employment commenced.

Nor were these new contractual requirements minor or trifling. As noted above in the factual background, pursuant to the non-compete agreement, Mr. Darr would have been required to abide by the terms of the non-compete agreement for at least three years, with the potential for up to three additional years from the date any violation of the agreement would have been found to have ceased. The non-compete clause, by its terms, would have applied throughout the United States and all its territories, and would have applied very broadly (though rather imprecisely) to his future endeavors, prohibiting him from engaging "in any business competing directly or indirectly with any product, venture, or service related in any manner to or concerning the Company's Business." Mr. Darr would have been potentially liable for damages far exceeding the ordinary measures of damages in contract, as well as for Employer's costs and attorney's fees. Pursuant to the terms of the non-compete agreement, he would have waived virtually all his potential defenses regarding the validity or construction of the agreement, in addition to any right to trial by jury. At the very least, had he signed the agreement, Mr. Darr would have faced the likelihood of expensive and protracted litigation in any attempt to clarify his rights or to protect his legal and economic interests. There can be no question that acceptance of the non-compete agreement would have constituted a substantial change in Mr. Darr's working conditions, from the objective viewpoint of a reasonably prudent person.

We note that the Commission itself has previously recognized the principle that an employee's refusal to sign a new contract containing additional non-compete

15

provisions need not constitute a bar to qualification for unemployment benefits. *Lost in the Fifties, LLC v. Reece*, 71 S.W.3d 273, 276-78 (Mo. App. S.D. 2002) (affirming Commission's award of benefits); *see also Glatfelter Barber Shop v. Unemployment Compensation Board of Review*, 957 A.2d 786, 792-93 (Pa. Commw. 2008) (applying similar legal principles under Pennsylvania law, holding that where non-compete agreement is presented "more as an ultimatum than as a matter to be negotiated," employee's refusal to sign does not constitute misconduct disqualifying employee from unemployment compensation).

Under the facts of this case, Employer's reported offer to permit Mr. Darr to transfer to a different department does not change the analysis. Again, we apply the standard of a reasonable person placed in Mr. Darr's position. Given the great and urgent priority Employer was placing upon acceptance of the non-compete agreement, it was reasonable for Mr. Darr to believe that, even if he accepted transfer to a less desirable and lower-paying position, he likely would still be confronted later with an ultimatum to sign the non-compete agreement. This is particularly true in view of the fact that Employer had that very week presented him with a non-negotiable document which recited, on its face, that his continued employment was "contingent upon signing this Agreement." Moreover, the expected lower total compensation of the alternative position would, in itself, have constituted a substantial change in Mr. Darr's wages or working conditions. Given his experience working for Employer, Mr. Darr's concern that a position in the marketing department would be less remunerative appears objectively reasonable.

The cases relied upon by the Commission in support of its contention that Mr. Darr's departure from employment was unreasonable are readily distinguishable. *See*

16

*O'Donnell v. Labor & Indus. Relations Comm'n*, 564 S.W.2d 87, 88-89 (Mo. App. St.L.D. 1978) (management trainee declined to be returned to cook position when management position was eliminated, despite having been offered increased wages and shorter hours); *Kimble v. Div. of Empl. Sec.*, 388 S.W.3d 634, 641-42 (Mo. App. W.D. 2013) (information technology employee quit after his position was eliminated, rather than accepting transfer to sales position); *Miller v. Bank of the West*, 264 S.W.3d 673, 676 (Mo. App. W.D. 2008) (bank employee quit rather than accepting higher percentage of time on the job performing teller functions); *Belle State Bank v. Industrial Comm'n of Missouri*, 547 S.W.2d 841, 844-47 (Mo. App. S.D. 1977) (two bank employees quit rather than accepting minor modifications in wage payment dates, sick leave accrual, and hours of work); *Schuenemann v. Route 66 Rail Haven, Ltd.*, 353 S.W.3d 691 (Mo. App. S.D. 2011) (motel maintenance employer quit rather than accepting some laundry duties, even though pay and benefits would have remained same); *see also Drake v. Lengel*, 403 S.W.3d 688, 690-92 (Mo. App. W.D. 2013).

These cases demonstrate the proposition that many types of changes in working conditions and duties, even if subjectively unwelcome, would not cause an objectively reasonable person to quit and voluntarily to choose unemployment. *See Hessler v. Labor & Indus. Relations Comm'n*, 851 S.W.2d 516, 618 (Mo. App. 2002) (finding of good cause requires "positive conduct which is consistent with genuine desire to work and be self supporting.") "Nothing in section 288.050 suggests a legislative intent to afford employment security in connection with an employee's right to hold a specific position. Rather, the law is designed to afford employment security in connection with the loss of employment, generally." *Kimble*, 388 S.W.3d at 640.

17

However, none of the cases cited by the Commission involve facts in which the proposed changes involved mandatory acceptance of contractual conditions, the enforcement of which may significantly constrain a person's future ability to earn a livelihood or to pursue a chosen occupation while simultaneously exposing the individual to potential litigation and liability. Applying the objective standard of a reasonable person confronting the same situation, we hold that Mr. Darr was faced with "external pressures so compelling that a reasonably prudent person would be justified in terminating his employment." *Shelby*, 128 S.W.3d at 170. As the court found in *Sokol*, 946 S.W.2d at 28, *supra*, "it is hard to conceive of a more critical or substantial change in the terms" of Mr. Darr's employment than those presented here.

We further note that on January 30, and again on January 31, 2013, Mr. Darr met with Employer's management personnel to discuss his concerns and to attempt negotiation of matters relating to the non-compete agreement. By making "an effort to resolve the troublesome situation before terminating his job," Mr. Darr demonstrated the good faith element required for a finding of good cause attributable to the employer. *Shelby*, 128 S.W.3d at 170. *Cf. Rufer v. Rauch*, 362 S.W.3d 28, 33-34 (Mo. App. S.D. 2012) (element of good faith not established where employee failed to attempt to resolve situation with employer prior to leaving employment); *Prock v. Hartville Feed, LLC*, 356 S.W.3d 839, 846-47 (Mo. App. S.D. 2012) (same).

The competent and substantial evidence in the record demonstrates that Mr. Darr met his burden of establishing both the reasonableness and the good faith of his actions. Under the facts of this case, Mr. Darr had good cause attributable to the employer for his voluntary departure from employment.

18

## CONCLUSION

For the foregoing reasons, we conclude that the Commission erred in finding that Mr. Darr was disqualified from receiving benefits. Sec. 288.050.1(1). The decision of the Commission is reversed and the cause is remanded to the Commission for determination of Mr. Darr's unemployment benefits in accordance with this opinion.

Karl A. W. DeMarce, S.J.

Robert M. Clayton III, C.J., and
Gary M. Gaertner, Jr., J., concur.