Lucille MANDACINA, Appellant,

v.

**HARRAH'S OF NORTH KANSAS CITY and Division of Employment Security, Respondents.**

**WD 79744**

Missouri Court of Appeals, Western District.

OPINION FILED: February 28, 2017

Samuel McHenry, Kansas City, MO, Counsel for Appellant

Arthur Neuhedel, Overland Park, KS, Counsel for Respondent, Harrah's

Mandolin Jackson, Jefferson City, MO, Counsel for Respondent, Div. of Employment

Before Division Four: Mark D. Pfeiffer, Chief Judge Presiding, Thomas H. Newton, and Lisa White Hardwick, JJ.

Thomas H. Newton, Judge

Ms. Lucille Mandacina appeals an order of the Labor & Industrial Relations Commission affirming an appeals tribunal ruling denying her unemployment compensation benefits because she had voluntarily left work without good cause attributable to the work or the employer. Ms. Mandacina challenges the sufficiency of

the evidence to support a finding that she voluntarily quit, and she argues that the evidence shows that she had good cause to "quit" her position as a casino table games dealer. We affirm.

Ms. Mandacina began her employment with Harrah's North Kansas City in August 2010, working as a table games dealer. The position required a valid Missouri gaming license. After Ms. Mandacina placed herself on the state's disassociated person's list, which forbids problem gamblers from going onto a casino floor other than for work, she used an ATM machine on the casino floor. She was cited for trespassing in 2012 for this conduct and fought the revocation of her gaming license, but ultimately failed. Ms. Mandacina learned in early November 2015 from her employer that her license had been revoked and she could no longer be employed as a casino dealer. Because she was concerned about her family's health-care coverage and was willing to work at a lower-paying position, Ms. Mandacina agreed to a thirty-day reassignment status that would allow her to continue her health-insurance benefit if she secured other available employment at Harrah's within that period.

The transcript is somewhat unclear as to whether Harrah's failed to "reach out" to Ms. Mandacina as promised to inform her about any job openings or whether she failed to fulfill her own responsibility to apply for jobs posted on the company's website. Regardless, Ms. Mandacina did not apply for any other position at Harrah's. When Ms. Mandacina learned that she could not apply for food stamps, collect unemployment compensation, or access her 401(k) savings if she remained on reassignment status until it was scheduled to conclude in mid-December, she signed a resignation letter on December 2, 2015. Ms. Mandacina knew that it was her responsibility to apply for other work at Harrah's.[1] According to the employer, a housekeeping position was available and posted on its website during Ms. Mandacina's reassignment period.

A deputy denied her application for unemployment benefits, and a Commission appeals tribunal affirmed, finding that Ms. Mandacina voluntarily separated from her employment when she signed the resignation letter on December 2, 2015, and that she did not have good cause attributable to the work or her employer to quit.[2] The Commission affirmed, and Ms. Mandacina filed this appeal.

### Legal Analysis

■ When reviewing a Commission decision, we must affirm unless "the commission acted without or in excess of its powers," "the decision was procured by

1. Ms. Mandacina testified that she did not apply for any jobs because none were available and company representatives did not reach out to her to inform about any openings. Still, she responded, "Yes," when the appeals referee asked Ms. Mandacina, "So did the employer, at any point tell you that you needed to be able to also look at positions and apply for them?" She also responded "Yes," when asked by the employer whether its representatives had made her aware that during the reassignment-status period "it was on [her] to find another position within the casino." The appeals referee also asked Ms. Mandacina if she had looked "at any positions after the meeting to see if something opened up after the meeting." Ms. Mandacina stated, "I looked—I was waiting to hear—to hear back from Cathy Seabert."

2. Applicable law disqualifies a claimant from receiving benefits, if "the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer. ... 'Good cause', for the purposes of this subdivision, shall include only that cause which would compel a reasonable employee to cease working or which would require separation from work due to illness or disability." § 288.050.1(1).

fraud," "the facts found by the commission do not support the award," or "there was no sufficient competent evidence in the record to warrant the making of the award." § 288.210 (1)–(4).[3] As to the sufficiency of the evidence, which is at issue here, and our authority when a question of law is implicated, we apply the following standard of review:

A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.

Nothing requires this Court to review the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the Commission's decision. The whole record is considered to determine if there is sufficient competent and substantial evidence to support the Commission's award. A reviewing court considers whether the Commission could have reasonably made its findings, and reached its result, upon consideration of all the evidence before it.

This Court defers to the Commission's factual findings and recognizes that it is the Commission's function to determine credibility of witnesses. This Court may not substitute its judgment on the evidence, and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there

is supportive evidence for the contrary finding.

We do not defer to the Commission's conclusions of law or its application of the law to the facts. Additionally, where, as here the Commission adopts the decision of the Appeals Tribunal, we consider the Tribunal's decision to be the Commission's for purposes of our review. *Sheridan v. Div. of Emp't Sec.*, 425 S.W.3d 193, 198–99 (Mo. App. W.D. 2014) (citations omitted).

■ Ms. Mandacina raises two points on appeal. The first point asserts that the evidence was insufficient to support the Commission's decision that she voluntarily quit her employment because "the evidence shows that the employer terminated her employment prior to any alleged 'quit.'" She argues that she performed no service and received no wages during the thirty-day reassignment period and thus her employment was terminated in November, before she signed the resignation letter. Ms. Mandacina contends that her employer removed her from her duties on November 12, 2015, offered no other duties despite her request to work and her "good standing," and stopped paying her wages. In this regard, she refers to our employment security law's "employment" definition as services performed for wages. § 288.034.1. The law defines "wages" as remuneration for personal services and excludes any payments an employer makes for medical insurance from the definition. § 288.036.1(1). She also argues that the loss of her license does not prevent her from receiving benefits under *Renda v. Eastern Metal Supply of Missouri, Inc.*, 414 S.W.3d 556, 559 (Mo. App. E.D. 2013).

Noting that "an employee will not be held to have left voluntarily when the em-

**3.** Statutory references are to RSMo (2000) as updated by cumulative supplement, unless otherwise indicated.

ployer decides to end the employment relationship," the court in *Renda* found that the employee truck driver who lost his driver's license due to a DWI arrest did not voluntarily quit his job. *Id.* In the court's view,

> [w]hile Claimant decided to drive while intoxicated, no evidence suggests Claimant was attempting to quit his job when he made that decision. Even though Claimant's decision to drink and drive led to the forfeiture of his [commercial driver's license], and eventually his termination, he did not drink and drive in an attempt to quit his job. Therefore, the DWI arrest alone is insufficient to prove Claimant voluntarily quit.

*Id.* Other evidence showed that the claimant continued driving while obtaining temporary licenses and, when they expired, offered to take a cut in pay and work in another capacity for the employer. *Id.* "These are not the actions of a person who wanted to quit his job," the court concluded. *Id.* The court distinguished *Board of Education of City of St. Louis v. Labor & Industrial Relations Commission*, 633 S.W.2d 126 (Mo. App. W.D. 1982), on which the Commission here relied, finding that the teacher with a temporary teaching certification made no effort to obtain permanent certification as required before the end of a 90–day period. *Renda*, 414 S.W.3d at 559. The truck driver, the court said, was unlike the teacher "who failed to take the steps necessary to continue working as a teacher." *Id. Renda*, which involved an *employer's* termination of the employment relationship, might be persuasive and relevant if the evidence showed that Harrah's

had terminated the employment relationship with Ms. Mandacina in November. But it does not.

■ The Commission concluded that Ms. Mandacina voluntarily left work effective December 2, 2015. It based this ruling on her engagement in prohibited conduct—going onto a casino floor in violation of disassociated person restrictions — which resulted in the loss of her gaming license and thus in her voluntary removal of herself from her position.[4] The employer had argued that the separation occurred for this reason, but the Division of Employment Security argues on appeal that we should affirm the Commission on a different ground, that is, what led to the separation was Ms. Mandacina's action in voluntarily signing the December 2 resignation letter to access her 401(k) savings and to gain unemployment benefits.[5]

According to the Division, Ms. Mandacina would not have had to sign a resignation letter to file for unemployment benefits and access her 401(k) savings, if her separation from employment occurred in November when she assumed reassignment status. It also cites *Darr v. Roberts Marketing Group, LLC*, 428 S.W.3d 717, 724 (Mo. App. E.D. 2014), where the court ruled that the employee voluntarily left employment when he left the employer's premises for the final time. This ruling was based on the court's position that "[t]he determinative question is whether the employer or employee committed the final act which severed the relationship." *Id.* (citing *Mauller v. Div. of Emp't Sec.*, 331 S.W.3d 714, 718 (Mo. App. W.D. 2011)). In *Darr*,

---

4. The Commission stated, "By freely engaging in the prohibited conduct [i.e., violating gaming commission rules] and losing her dealer's license, the claimant voluntarily removed herself from her position."

5. We may uphold a Commission decision despite a wrong or insufficient reason for the ruling. *See Johnson v. Div. of Emp't Sec.*, 318 S.W.3d 797, 807 (Mo. App. W.D. 2010) (stating, "[W]e will uphold a decision of the Commission if the Commission clearly got the right result, but for the wrong reason").

the employer had presented to its employees a non-compete agreement that they were required to sign as a condition of employment within one week, or by February 1, 2013. *Id.* at 721. Mr. Darr had a number of conversations with human resources personnel, indicating his desire to have a lawyer review the agreement before he signed it. *Id.* at 721–22. With conflicting evidence over whether the employer permitted Mr. Darr to have extra time for legal review while allowing him to continue working beyond the deadline, the court found dispositive that Mr. Darr left the premises on February 4, 2013, and never returned to work in violation of the employer's absenteeism rule. *Id.* at 722.

In *Mauller*, we found that the employee, who worked for a caterer on an on-call basis, had voluntarily left her position when she sought separation papers so she could apply for food stamps. *Mauller*, 331 S.W.3d at 717–18. We rejected the employee's argument that "she did not voluntarily leave her employment because Employer did not contact her for further work," noting that before requesting the separation papers, the employee "did not inquire as to whether she was discharged, nor was [she] ever informed directly or indirectly that she was discharged." *Id.* at 718.

We agree with the Division that Ms. Mandacina voluntarily left work on the day she signed the resignation letter. This was the last act that severed the relationship. Like the claimant in *Mauller*, the existence of the relationship did not turn on whether the employee was providing services and receiving wages; rather, the ongoing reassignment or on-call status was evidence that the employer had not discharged the employee. This point is denied.

■ The second point asserts that the evidence was insufficient to show that Ms.

Mandacina lacked good cause to quit because "any reasonable person would leave a 'job' that provided no hours of work and no financial remuneration or wages and acted only as a block to the employee accessing her own savings." She claims that Harrah's had so drastically changed the terms and conditions of employment that she had no choice but to resign. Ms. Mandacina cites *Armco Steel Corp. v. Labor & Industrial Relations Commission*, 553 S.W.2d 506, 508 (Mo. App. 1977), because there the court found that an employee who had been demoted and would have been required to accept a 44–percent reduction in wages had good cause to leave his job voluntarily. The Commission here ruled that Ms. Mandacina "lost her employment because she lost her ability to meet the conditions of her employment" and the employer had no obligation "to put [her] in a position different from the one she was performing. The loss was due to the claimant's personal circumstances."

The Division agrees that significantly reduced hours could constitute good cause for voluntarily leaving employment, but argues that the reduction in hours was due to Ms. Mandacina's own actions in losing her required gaming license and that Harrah's actually gave her the opportunity to apply for other positions not requiring a license, but she unreasonably failed to avail herself of that opportunity. In her reply brief, Ms. Mandacina argues that the Commission did not find that she failed to apply for an available position and contends that the evidence, in fact, shows that she "looked for employment and was repeatedly told no work was available; testimony coming from the appellant and the employer's Employee Relations Representative." [6]

Regardless whether the evidence showed that Ms. Mandacina sought alter-

---

**6.** We have found in the hearing transcript

evidence that Ms. Mandacina's contacts with

native employment with Harrah's or waited for Harrah's to offer her an alternative position, we believe that her reasons for separating from employment were not attributable to the work or the employer. Ms. Mandacina was required to have a gaming license to work as a table games dealer for Harrah's. She voluntarily placed herself on the disassociated persons list because she believed she was losing too much money gambling. She violated the conditions imposed on disassociated persons and lost her gaming license. Without that license, she could not continue to work as a table games dealer. This case is analogous to *Smith v. Labor & Industrial Relations Commission*, 869 S.W.2d 101, 103 (Mo. App. W.D. 1993), where the employee was unable to continue working for his part-time employer because he lost his full-time job and could no longer afford to pay his telephone bill, and a telephone was required to do his part-time job. We determined that, similar to an employee whose personal illness or disability—unrelated to the workplace—causes the employee to miss work and is consequently discharged, Mr. Smith's inability to perform the work was not caused by his work or employer. *Id.* Ms. Mandacina's voluntary placement of her name on the disassociated persons list had no relationship to her work or employer. She did so for personal reasons. That she violated gaming commission restrictions on disassociated persons and lost her gaming license was unrelated to the work or employer. The evidence showed that 80 percent of Harrah's jobs required gaming licenses. Ms. Mandacina had indicated an interest in working as a restaurant server, and no server positions were available at Harrah's during the period of time she had reassignment status. When she signed the resignation letter, she did

her employer occurred just twice: once when she spoke with company representatives in mid–November and was told about the reassignment-status option, and once when she

so because she was in need of the funds in her 401(k) savings for personal reasons. We conclude that the Commission correctly determined that Ms. Mandacina did not have good cause attributable to the work or the employer to voluntarily separate herself from her employment. This point is denied.

### Conclusion

Because sufficient evidence supports the Commission's determination that Ms. Mandacina voluntarily terminated her employment relationship with Harrah's and lacked good cause attributable to the work or the employer in doing so, we affirm.

Mark D. Pfeiffer, C.J., and Lisa White Hardwick, J., concur.

terminated that relationship on December 2, 2015, so she would be able to access her 401(k) savings.